**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **GERALD SENSABAUGH,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | **No. 2:18-CV-11** |
| | ) | **Reeves/Corker** |
| **KIMBER HALLIBURTON, in her** | ) | |
| **official and individual capacities, and** | ) | |
| **WASHINGTON COUNTY BOARD** | ) | |
| **OF EDUCATION,** | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION**

This First Amendment retaliation action is brought pursuant to 42 U.S.C. § 1983 by

Gerald Sensabaugh, the former head football coach at David Crockett High School against

the Washington County Board of Education (the Board) and Kimber Halliburton in her

individual and official capacities. Sensabaugh alleges that he engaged in protected speech

in the form of Facebook posts on September 22 and 24, 2017. Sensabaugh also alleges that

in retaliation for these two posts, he was subjected to the following adverse actions that

violated his First Amendment rights: (1) October 6, 2017 Letter of Guidance; (2) October

9, 2017 Letter of Reprimand/Suspension; and (3) March 15, 2018 termination.

The case is presently before the court on two motions: (1) Halliburton's motion for

summary judgment on the grounds of qualified immunity; and (2) the Board's motion to

dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because Sensabaugh has failed to state a claim for which relief can be granted and Halliburton is entitled to qualified immunity, defendants' motions will be granted and this action dismissed in its entirety.

## I. Background

The backdrop for this case sounds like something out of the movies: a high school football star from East Tennessee makes it big in the NFL, plays eight years professionally, and then returns home to coach a previously mediocre high school program to "unprecedented success." In Hollywood, the plot would inevitably climax with the team overcoming long odds to clinch the state championship. But in this case, that's not what happened. Instead, in the middle of the football season, the school district called foul play on the coach, the coach claimed the district was out of bounds, and now the court must step in as referee.

In January 2017, the Washington County Board of Education hired former Dallas Cowboys player Gerald Sensabaugh to serve as the head football coach at David Crockett High School. By October, the school's football team was ranked first in its region and classification. Despite the team's success, Sensabaugh had his mind on other matters. Specifically, he was increasingly disappointed with certain issues in the district—including deteriorating facilities and the allocation of funding to the high school's feeder elementary schools—and he wanted to make his views known.

On September 22, 2017, Sensabaugh visited Jonesborough Elementary School, one of the oldest buildings in the district. Administrative personnel at the school gave him permission to take photographs of the classrooms, which included some students. Later that day, Sensabaugh made a post on Facebook entitled "The real problem in Washington County," in which he commented on the school's design and poor learning conditions for the students. The post also included some photographs from his visit. Soon after the post went live, Sensabaugh began receiving calls and texts from the Washington County Director of Schools, Kimber Halliburton. In one text, Halliburton wrote, "I know you are trying to help. However, there is a history and information I need to share with you.… I need for you to know all the facts so that you can better help us." Sensabaugh was asked to remove any photo showing a child's face, but not any posts or other content. Sensabaugh did not take the photo with the children down as directed on September 22, 2017.

Two days later, on September 24, 2017, Sensabaugh made another Facebook post, entitled "The real problem in Washington County Pt. 2." In this post, Sensabaugh commented on the district's use of prison laborers to perform certain school maintenance work while students were on site. Approximately four hours later, Sensabaugh received the following text from Halliburton: "I see you've posted something else before knowing all the facts. Uncertain why you are not taking my calls. I really would like to speak to you." Sensabaugh responded, "I don't need to know all the facts. Just my observation." He agreed to call the director shortly thereafter, and then texted: "Just let me know the next step. Fire me or deal with it."

On October 5, 2017, Sensabaugh received a "Letter of Guidance" from Peggy Wright, the principal at David Crockett High School. The letter addresses Sensabaugh's alleged use of profanity when speaking to students; his failure to follow doctors' orders regarding football players who have not been cleared to practice or play; his unprofessional conduct in communicating with other employees; and his failure to comply with multiple requests to remove the photo depicting students' faces from his Facebook page. In the Letter of Guidance, Wright once again directs Sensabaugh to remove the *photograph* from Facebook but emphasizes that "[a]t no time did we ask you to delete any of your comments or opinions on social media." The letter concludes with a warning that failure to follow the principal's directives "may lead to discipline up to and including termination as [the school's] football coach."

On October 9, 2017, Wright sent Sensabaugh a second letter, reprimanding him for continued unprofessional conduct and recommending that he be placed on administrative leave ("Letter of Reprimand/Suspension"). The letter details additional allegations against Sensabaugh, including arriving late to a meeting; consistently interrupting and yelling at other staff; spreading rumors that the athletic director is addicted to and attempting to distribute Oxycodone; threatening the athletic trainer in front of students and parents; and continuing to use profanity toward players. Wright also mentions that several students and employees have stated that they are fearful of Sensabaugh.

The next day, on October 10, 2017, Sensabaugh was placed on paid administrative leave, pending an investigation into the allegations of improper conduct. Phillip Baker of

the law firm Ensley, Baker & Shade was the lead attorney assigned to conduct the investigation.

On January 19, 2018, while the investigation was ongoing, Sensabaugh filed suit against the Washington County Board of Education and Director Halliburton. He alleges that the defendants, acting under the color of state law, retaliated against him in violation of his First Amendment right to speak out on matters of public concern. Sensabaugh denies the allegations contained in the Letter of Guidance and the Letter of Reprimand/Suspension, and states that they are merely a "pretext" to mask defendants' real motive: retaliating against him for exercising his free-speech rights on Facebook.

On February 23, 2018, Sensabaugh amended his complaint to add additional facts and allegations related to a letter that he received from Halliburton. In the letter, Halliburton notifies Sensabaugh that Baker completed his investigation and concluded that Sensabaugh "engaged in unprofessional, insubordinate, threatening, and retaliatory behavior toward supervisors, staff, and students." Based on these findings, Baker recommended that Halliburton terminate Sensabaugh's employment as head football coach. Halliburton informs Sensabaugh of this recommendation, and states that before she makes her final decision, she wishes to give Sensabaugh the opportunity to respond, and to provide her with evidence either to rebut Baker's findings or in support of a less severe punishment. Sensabaugh contends that Halliburton's letter incorporating the "Baker Recommendation" amounts to further adverse action against him. Sensabaugh did not respond to Halliburton's letter, and Halliburton terminated Sensabaugh's employment on March 15, 2018.

Defendants move to dismiss Sensabaugh's complaint on grounds that Sensabaugh fails to allege an actionable "adverse action," and Halliburton is entitled to qualified immunity.

## II. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must articulate a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); FED. R. CIV. P. 8(a). When ruling on a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations in the complaint as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Dismissal is appropriate only if the court finds that the plaintiff "can prove *no* set of facts in support of his claims that would entitle him to relief." *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir. 1990) (emphasis added).

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

**III.    Discussion**

"The First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee." *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017). To prove a claim of First Amendment retaliation, the plaintiff must plead factual allegations that, if true, establish the following

three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Harris v. Detroit Pub. Sch.*, 245 F. App'x 437, 442 (6th Cir. 2007). If the employee establishes a *prima facie* case, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294-95 (6th Cir. 2012).

In the Sixth Circuit, an "adverse action" is one that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014). The phrase has traditionally referred to actions such as "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). However, "*any* action that would deter a person of ordinary firmness from exercising protected conduct will suffice." *Id.* (emphasis added). Even so, the Sixth Circuit cautions that courts "must be careful to ensure that real injury is involved, lest we trivialize the First Amendment…." *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005). Determining whether an adverse action has occurred is an objective inquiry, that must be tailored to the circumstances. *Stolle v. Kent State Univ.*, 610 F. App'x 476, 483 (6th Cir. 2015).

In his complaint, Sensabaugh alleges that the defendants took three adverse actions against him in retaliation for his Facebook posts: (1) issuing the Letter of Guidance; (2) issuing the Letter of Reprimand/Suspension; and (3) terminating him from his position as head football coach. The court will address the sufficiency of each action. If Sensabaugh can point to facts supporting all three elements of a *prima facie* case, the court will next consider whether defendants can demonstrate that they would have taken the same action regardless of Sensabaugh's protected conduct.

## A. Qualified Immunity

Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Therefore, if a defendant asserts qualified immunity, the plaintiff bears the burden of showing (1) a violation of a constitutional right, and (2) that the right at issue was clearly established at the time of the defendant's alleged misconduct. *Barker v. Goodrich,* 649 F.3d 428, 433 (6th Cir. 2011). A clearly established right must be described to a reasonable degree of certainty in Supreme Court or lower court precedent. For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what she is doing violates that right. In determining whether a constitutional right is clearly established, this court looks first to decisions of the Supreme Court, then to decisions of the other courts within the Sixth Circuit. *Bell v. Johnson,* 308 F.3d 594, 601-02 (6th Cir. 2002). Qualified immunity is a personal defense that applies

only to government officials in their individual capacities. *Everson v. Leis,* 556 F.3d 484, 501 n. 7 (6th Cir. 2009).

Halliburton asserts that in deciding to terminate Sensabaugh, she was entitled to rely on information provided to her by (1) employees of the school system, (2) students in the school system, and (3) the outside law firm brought in to investigate the allegations. As the Sixth Circuit explains:

> In a case such as this where one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers, we consider: (1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information.

*Brown v. Lewis,* 779 F.3d 401, 413 (6th Cir. 2015).

Halliburton provided a Declaration stating the facts known to her at the time she issued the Letter of Guidance, Letter of Reprimand/Suspension, and ultimately terminated Sensabaugh's employment. In the late summer of 2017, several members of the Board reported to Halliburton that parents or others had complained about the language that Sensabaugh was using with the football players. Halliburton discussed this with Principal Wright and Athletic Director Josh Kite. Thereafter, Kite advised Halliburton that he had discussed the issue with Sensabaugh and that Sensabaugh agreed to correct the problem. In mid-August of 2017, a parent complained to Kite about Assistant Coach Treadway using profane and inappropriate language. Kite advised Sensabaugh to instruct Treadway to stop using such language. On September 18, 2017, Kite addressed with Sensabaugh his use of profanity. Sensabaugh responded by asking Kite to extend the caution tape at football

games further out, implying that would make it more difficult for others to hear Sensabaugh on the sidelines. As the Letter of Guidance was being prepared, Wright interviewed several students who told her that Sensabaugh had directed the following phrases to or at individual students/players or to the football team collectively. "You are pieces of sh*t," "You f**king sh*ts," and "You mother**kers."

On September 22, 2017, Sensabaugh visited Jonesborough Elementary School. After his visit, he posted the first Facebook post regarding conditions at the school. As part of the post, Sensabaugh included photos of a classroom with elementary school students. One photo clearly showed the faces of two students. The principal of the school contacted the Director of Human Resources and expressed his concern about the photo showing students' faces and advised that he did not know whether the school had a written parent consent. The HR Director then discussed the principal's concerns with Wright and Halliburton. Halliburton was aware that the public posting of a photo showing a child's face could be violative of both the Board's policy and the Family Educational Rights and Privacy Act. Halliburton contacted legal counsel for the Board, and then she and Wright attempted to call Sensabaugh who did not answer. Halliburton instructed Wright to contact Sensabaugh and direct him to immediately remove any photo showing a child's face, but not the posts or any other content. Wright texted Sensabaugh that he was directed to take down any photos showing students' faces but she did not direct Sensabaugh to remove any post or content. Sensabaugh did not take the photos down as directed.

On September 24, 2017, Sensabaugh posted on Facebook safety concerns about prisoners doing work on the school campus during school hours. Wright and Halliburton spoke to Sensabaugh by phone and attempted to address the safety concerns that Sensabaugh had raised and again requested that he remove the photo of children from Facebook. They specifically advised Sensabaugh that he did not need to take down the posts, just the photo of the students. During this conversation, Sensabaugh yelled at them and told them that he was not taking the photo down. Then, he hung up on them. He texted Halliburton "Just let me know the next step. Fire me or deal with it." Sensabaugh did not remove the photo showing students' faces until after the Letter of Guidance was delivered to him at a meeting on October 6, 2017.

Halliburton states that at no time did she or Wright instruct Sensabaugh to remove the Facebook posts or instruct him to remove any content. The Letter of Guidance specifically stated: "At no time did we ask you to delete any of your comments or opinions on social media. You have the right to comment on matters of public interest on social media." The Letter of Guidance also addressed a concern raised by Athletic Trainer Bryon Grant. Grant sent Sensabaugh an email advising him that certain students were under the care of a physician or trainer and should not play or practice. According to information Grant provided to Halliburton, Sensabaugh violated those instructions by practicing one of the injured players. The Letter of Guidance closed as follows:

> I am directing you to bring any and all safety concerns to me as principal. Furthermore, I am directing you to immediately stop using profanity when speaking to our students/football players and to follow the athletic trainer's/doctor's orders completely for injured students to protect their safety. You are further directed to refrain from yelling or screaming at me,

our Athletic Director, and any other employee of the Washington County School System. I am once again directing you to take the picture of the Jonesborough Elementary students off of your post on social media to protect the privacy of the students whose pictures you did not have permission to use.

Failure to follow my directives may lead to discipline up to and including termination as our football coach.

The issuance of the Letter of Guidance did not itself impose any discipline or alter Sensabaugh's employment conditions in any way. And Principal Wright's warning to Sensabaugh that "[f]ailure to follow my directives may lead to discipline up to and including termination" does not constitute an adverse action. The directives in the letter simply instruct Sensabaugh to conform his behavior to certain standards of professional conduct *unrelated* to his right to comment on matters of public interest on his Facebook page. As Wright expressly acknowledges in the Letter of Guidance: "You have the right to comment on matters of public interest on social media."

Even if the Letter of Guidance was issued as a "pretext" to punish Sensabaugh for his social media comments, the court finds that a written reprimand, without more, is insufficient as a matter of law to support a First Amendment retaliation claim. The Sixth Circuit has been clear that "when a plaintiff's alleged adverse action is inconsequential, resulting in nothing more than a *de minimis* injury, the claim is properly dismissed as a matter of law." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012); *see also Russell v. Metro. Nashville Pub. Sch.*, 2012 WL 3241664 at *5 (M.D. Tenn. Aug. 7, 2012) ("Plaintiff's being 'written up' is not an adverse employment action under the facts of this

case."). The court will next examine Halliburton's actions with respect to the Letter of Reprimand/Suspension.

Principal Wright provided a Declaration of events she reported to Halliburton regarding the meeting with Sensabaugh and its aftermath. On October 6, 2017, the Letter of Guidance meeting with Sensabaugh was tape recorded. Halliburton was not present for this meeting, but others reported to her about Sensabaugh's conduct. Halliburton was told that Sensabaugh became agitated, began pacing back and forth, became belligerent and confrontational. He interrupted Wright as she read the Letter of Guidance. Sensabaugh then accused Athletic Director Kite of coming to work "high" on prescription medication, and of offering Sensabaugh this medication on multiple occasions. The recording of the meeting corroborates these statements.

After the meeting, Sensabaugh proceeded to the high school cafeteria where the players and coaches were getting their pre-game meal before the football game later that evening. Sensabaugh confronted Athletic Trainer Grant. Grant stated Sensabaugh appeared angry, paced back and forth, and said: "I'm coming after you. I'm coming after your job. You're not a real trainer. You're a wannabe trainer. I've got a real trainer from Dobyns Bennett ready to take your job." Grant reported that he felt intimidated and he was concerned that Sensabaugh would become physical if Grant attempted to argue. This confrontation occurred in the presence of students and coaches. Sensabaugh also challenged the injured student in front of everyone and said: "Did you tell them I practiced you?" The student answered "yes" while holding his head down as if he was afraid of Sensabaugh. Wright received almost identical accounts from other parents and coaches

present in the cafeteria. Coach Lewis also reported that Sensabaugh said "I'm going after Josh next. Josh tried to throw me under the bus too."

At the football game later that evening, it was reported that Sensabaugh again used profanity in front of coaches and players. Coach Lewis reported that a player fumbled and as he was running off the field, Sensabaugh loudly stated: "Don't let that f**ker run the ball again this year." Coach Qualls also confirmed that Sensabaugh called the student who fumbled the ball a "f**ker." Qualls also reported that prior to the game, Sensabaugh proclaimed loudly so that everyone around, including students, could hear: "Josh Kite has a drug problem and has offered me Oxycodone. He carries it around the school and I don't care who hears me." Qualls told Wright that "the kids are fed up with Coach Sensabaugh."

Halliburton again sought advice from the Board's legal counsel, who recommended Halliburton issue a letter of reprimand and suspend Sensabaugh with pay pending the outcome of an investigation by an outside law firm. A Letter of Reprimand was drafted advising Sensabaugh of his suspension with pay pending investigation. Kite was also suspended with pay pending investigation into Sensabaugh's allegations of drug use.

Again, as with the Letter of Guidance, the court finds that the Letter of Reprimand/Suspension does not constitute an adverse action against Sensabaugh. The Sixth Circuit has squarely held that "being placed on paid administrative leave while an investigation is conducted into suspected wrongdoing is not an adverse action." *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017). Accordingly, the issuance of the Letter of Suspension/Reprimand and the subsequent suspension are not adverse actions. This is so despite Sensabaugh's claim that the letter did not contain "any instructions or information"

as to how he would be paid while on administrative leave. Nowhere does Sensabaugh actually allege that he was suspended without pay, and the record indicates that he was in fact paid during this period. Thus, even accepting all Sensabaugh's allegations as true and drawing all reasonable inferences in his favor, the court finds that Sensabaugh fails to allege an actionable adverse action regarding the Letter of Suspension/Reprimand. The court will proceed to examine Halliburton's decision to terminate Sensabaugh's employment.

The Letter of Reprimand/Suspension was given to Sensabaugh at a meeting with Wright on October 10, 2017. Assistant Principal John Verble and Curtis Fullbright were present for that meeting which was tape recorded. During this meeting, Sensabaugh was rude and insubordinate. He questioned Wright about her actions as Principal and attacked her competence. The recording of the meeting substantiates these statements.

In late January 2018, Halliburton was informed that a bus driver recalled Sensabaugh riding the bus with footfall players on one occasion and recalled Sensabaugh cursing at the players during that trip. The video relating to that bus trip was located and was provided to Halliburton. The video corroborates the bus driver's account of Sensabaugh's behavior.

On February 9, 2018, the law firm investigating the allegations against Sensabaugh issued its report. It recommended that Sensabaugh be terminated. Relying on the findings and recommendations made in the investigative report, Halliburton wrote to Sensabaugh inviting him to provide any "written statements or other evidence you wish me to consider in your defense, whether in rebuttal to Attorney Baker's findings or in support of a less

severe punishment. Alternatively, you may request a meeting with me to present your defense and to explain why I should not terminate you." Sensabaugh made no response to the findings of the investigative report, nor did he request a meeting with Halliburton. Sensabaugh's employment was terminated on March 15, 2018.

In making the decision to terminate Sensabaugh, Halliburton relied on (1) the investigative report, (2) statements made by Sensabaugh, (3) recording of the Letter of Guidance meeting, (4) recording of the Letter of Reprimand/Suspension meeting, (5) videos showing Sensabaugh cursing at the students, and (6) the recommendation of the outside investigators. After consulting with the Board's legal counsel, the decision was made to terminate Sensabaugh's employment.

Based upon the record herein, the court finds that no reasonable jury could find that Sensabaugh's Facebook posts were a substantial motivating factor for Halliburton's decisions to issue the Letters of Guidance/Reprimand/Suspension or to terminate Sensabaugh. Halliburton decided to terminate Sensabaugh only after a complete investigation by an outside law firm and after Sensabaugh had been given an opportunity to respond to the investigation findings. Even if Sensabaugh had established a *prima facie* case, Halliburton has established through substantial evidence that she would have terminated Sensabaugh's employment absent his protected speech. Sensabaugh's actions of insubordination, use of profanity towards students, and retaliatory conduct toward students and co-workers were an independent justification for Halliburton's actions. There is no constitutional injury under the facts of this case. Accordingly, the court finds that Halliburton is entitled to qualified immunity.

## B.  Municipal Liability

As regards the Board, Sensabaugh's complaint contains no allegation of a policy or practice of the Board that was a moving force in causing an alleged First Amendment violation.  Instead, he seeks to hold the Board liable for the actions of Halliburton.

A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.  *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.  *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005).  A municipality may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  *Monell,* 436 U.S. at 694.

Here, the Board has a policy that encourages and respects employee rights to freedom of expression under the First Amendment to the Constitution of the United States.  That policy says "Statements made by an employee acting as a private citizen and speaking on a matter of public concern are protected speech and thereby not subject to disciplinary action by the school system."  Moreover, the Board cannot be held liable for any actions of Halliburton because there is no *respondeat superior liability* under § 1983.  *Burgess v. Fischer,* 735 F.3d 462, 478 (6th Cir. 2013).  There must be a constitutional violation for a § 1983 claim against a municipality to succeed – if the plaintiff has suffered no

constitutional injury, his *Monell* claim fails.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Accordingly, the court finds that Sensabaugh fails to state a claim against the Board for which relief can be granted and the Board's motion to dismiss is granted.

## IV.    Conclusion

In light of the foregoing discussion, the court finds that Sensabaugh's complaint fails to state a claim upon which relief may be granted against the Washington County Board of Education. In addition, Halliburton is entitled to qualified immunity as to Sensabaugh's claims against her in her individual capacity.  Accordingly, The Board's motion to dismiss [R. 32] is **GRANTED**, and Halliburton's motion for summary judgment [R. 26] is **GRANTED**.

ORDER TO FOLLOW.

UNITED STATES DISTRICT JUDGE